Filed 5/14/13  P. v. Bilbrey CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES S. BILBREY,<br><br>    Defendant and Appellant. | A129236<br><br>(Solano County<br>Super. Ct. No. VCR198866) |

James S. Bilbrey appeals from his conviction for attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664), aggravated mayhem (§ 205), and assault with a deadly weapon (§ 245, subd. (a)(1)).  Bilbrey makes the following assertions of error:  (1) insufficient evidence supported his specific intent to kill or to maim; (2) the trial court failed to instruct the jury with CALCRIM No. 570; (3) the trial court wrongfully instructed the jury with CALCRIM Nos. 3471 and 3472; (4) the prosecution violated its discovery obligations, seriously prejudicing his case; (5) he was denied effective assistance of counsel because his trial counsel withdrew a request for a mistrial, even though the trial court was willing to grant the request; (6) less significant errors operated in combination to create reversible error; and (7) his sentence of life in prison, with the possibility of parole, constitutes cruel and unusual punishment.

We affirm the judgment of the trial court.

---

[1] Unless otherwise indicated, all statutory citations are to the Penal Code.

1

# BACKGROUND

## I. *Procedural Background*

On March 13, 2009, an information was filed charging Bilbrey with attempted murder (§§ 187, subd. (a), 664), aggravated mayhem (§ 205), assault with a deadly weapon (§ 245, subd. (a)(1)), and battery causing serious bodily injury (§ 243, subd. (d)). The information also alleged, for each of the four counts, that Bilbrey personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)).

On December 11, 2009, a jury found Bilbrey guilty on all four counts and found true the two sentencing allegations.[2] On June 2, 2010, the court denied Bilbrey's motion for a new trial and proceeded to sentencing.

At sentencing, the court dismissed the fourth count (battery causing severe bodily injury), along with its enhancements, as a lesser included offense. The court used the count of attempted murder as the principal determinate count and imposed the midterm of seven years, plus three years for the section 12022.7, subdivision (a), enhancement, plus one year for the section 12022, subdivision (b)(1), enhancement—for a total base term of 11 years. On the assault count, the court imposed the midterm and stayed the sentence and enhancements pursuant to section 654. On the count of aggravated mayhem, the court imposed an indeterminate term of life with the possibility of parole, to run concurrently with the determinate term.

On June 10, 2010, Bilbrey filed a timely notice of appeal.

## II. *Evidence Presented at Trial*

### A. *The Prosecution Case*

### 1. *The Argument Outside the Bar*

In the early morning hours of July 13, 2008, David Apple, Michael McDaniel, Melvin Black, and Andrew Buchanan were at the Past Time bar on First Street in

---

[2] The jury verdict form did not ask the jury to make a finding concerning the section 12022.7, subdivision (a), enhancement attached to the section 243, subdivision (d), count.

Benicia. Apple identified Bilbrey as being in the bar that night, along with a friend of his, David Becchio.[3] Apple heard Bilbrey say to someone, "I'm from Richmond." McDaniel also remembered Bilbrey and Becchio being in the bar, noticing them because they were confrontational and stared at people. Buchanan said that inside the bar, Bilbrey seemed upset and rude, talking in a disrespectful manner to people with whom he came in contact.

Around 2:00 a.m., Apple left the bar to make a phone call. While talking on the phone, Bilbrey bumped him from behind. Apple turned around and said, "What's going on? What's your problem?" or "Dude, what the fuck?" Bilbrey responded, "I'm from Richmond." Apple said: "It's not where you're from. It's where you're at." or "The hell with Richmond. We're in Benicia." At this point Apple and Bilbrey squared off, as if to fight. McDaniel, Black, and Buchanan witnessed all or part of this confrontation.

Someone said that Bilbrey had a knife and McDaniel pulled Apple back. Both Apple and Black saw Bilbrey holding a knife. According to Buchanan, Bilbrey said he had a knife and wanted to fight.

Benicia Police Officer Mark Simonson was on patrol and noticed the men arguing outside the Past Time bar. Simonson drove between the two groups and told them to go their separate ways. He told Bilbrey and Becchio to walk north on First Street, while Apple and his friends walked west on H Street.

Simonson then contacted Bilbrey and Becchio about two blocks up First Street. Bilbrey said there had been an argument at the bar, but there was no problem and they would like Simonson to call a cab for them. Simonson asked police dispatch to call a cab company and have a cab sent, but about 30 seconds later a cab came down First Street. The driver, Ernest Alameda, said he was en route to a fare, but would call and ensure that another cab was coming. Simonson departed while Alameda was still on the scene.

---

[3] The witnesses all described Bilbrey's friend as the taller of the two. It was uncontested during trial, and confirmed by Bilbrey, that Bilbrey's companion was Becchio. In reciting the facts, we refer to Becchio by name, even when the witnesses were not able to name the companion.

## 2. *Joseph and Rachelle Tomada's Accounts*

Joseph Tomada and his sister, Rachelle Tomada (Rachelle), were also at the Past Time bar that evening. They left the bar when it closed at 2:00 a.m., and walked down First Street intending to go to Rachelle's condominium. As they walked, they heard some people talking and cursing, but did not know where the words were coming from, and did not think the words were directed at them. Tomada heard the voices say they were from Richmond and he yelled out "Faggots," and told whoever it was to go back to Richmond. Tomada and Rachelle then heard people coming up behind them and Rachelle heard someone say, "What the fuck did you call me?" or "What the fuck did you say?" Rachelle turned around and saw Bilbrey, holding a knife in his hand, and Becchio.

Tomada heard Rachelle say, "He has a knife," turned around, and saw Becchio in front of him. Bilbrey was standing to the side with a knife in his hand. Becchio swung at Tomada after saying, "You going to be a little bitch?" Tomada returned the punch, hitting Becchio on the chin. Becchio fell to the ground, got up, and charged Tomada. Tomada hit Becchio in the face and Becchio again fell to the ground.

As Tomada struck Becchio the second time, Bilbrey hit him in the face. Tomada saw a white flash, and everything went black. He backed up, trying to rub his eyes, and felt something go into his mouth. He felt his teeth break and something slide in and cut his tongue. Tomada felt his face and it seemed to him "like a giant razor cut" down the side of his face and he felt his "whole face kind of flap" when he exhaled. He realized he had been cut and he threw a punch at the face of the brown shadowy figure he could perceive in front of him. Bilbrey fell to the ground and Tomada felt something in his leg that caused him to buckle and fall on top of Bilbrey. Tomada continued punching Bilbrey on the ground, trying to hold down the hand in which Bilbrey held the knife.

Eventually, the struggle on the ground stopped and someone helped Tomada up and led him to a taxi where he laid across the trunk.

### 3. *Ernest Alameda's Account*

After Alameda had called for a cab for Bilbrey and Becchio, he made a U-turn on First Street and saw the two running up to Tomada and Rachelle. One of them had a shiny thing in his hand that looked like a knife. Alameda thought this did not look right, so he turned around again and parked, at which point the men were fighting. Alameda pushed Becchio away when Becchio tried to get involved in the fight that was now between Bilbrey and Tomada. Three males came running up when the fight was over and separated Bilbrey and Tomada, taking Tomada to Alameda's cab. None of these three men punched or kicked Bilbrey or Becchio.

### 4. *Michael McDaniel's Account*

After Simonson broke up the argument in front of the Past Time bar, McDaniel, Black, Buchanan and Apple began walking to the house in which the latter three lived, making a left from First Street going towards Second Street. The group turned onto Second Street but instead of proceeding towards the house, they took an alley that led back to First Street.[4] McDaniel could not explain why they went back to First Street— "[i]t was just a split decision."

When he reached First Street, McDaniel saw Tomada and Bilbrey "squared up" and "confrontational" across the street. Becchio was 20 feet away from them. McDaniel saw Tomada and Bilbrey swing at each other at the same time. Both fell, with Tomada on top of Bilbrey. They threw blows back and forth on the ground for 30 to 40 seconds. When the fighting stopped, McDaniel and Buchanan crossed the street and called Black, who was around the corner and arrived moments later. Black helped Tomada to a taxi. Neither he, Black, nor Buchanan punched or kicked Bilbrey at any time.

---

[4] Apple testified that he did not accompany the others back to First Street and McDaniel said that Apple was not on the scene of the fight. Apple testified that he was picked up and driven home by his cousin's wife. However, in his initial statement to police, Apple said that shortly after separating from the others he received a call that "[t]he Richmond boys" were "at it again" and he went back to First Street to see what had happened, arriving to see Tomada covered in blood.

### 5. *Melvin Black's Account*

Black testified that as he walked home, he received a phone call from Buchanan and in response to that call went back to First Street. He went through the same alley that McDaniel described and, from inside the alley, observed the fight between Tomada and Bilbrey across First Street. He saw Tomada and Bilbrey facing each other, with Becchio next to Bilbrey. Tomada and his sister were arguing with Bilbrey and Becchio and Rachelle was trying to pull Tomada away, telling Bilbrey and Becchio to leave. Black did not know who started the argument. Bilbrey was holding something shiny, but Black could not see what it was.

Tomada and Becchio squared off and swung at each other. Becchio stumbled to the ground and Bilbrey came up and hit Tomada with the hand holding the shiny object Black had previously noticed. Tomada screamed and Black decided to run across the street. Tomada stumbled back and then swung at Bilbrey. As Tomada hit Bilbrey, Bilbrey swung again and they both dropped to the ground, with Bilbrey on his back and Tomada on top of him. Black saw Bilbrey's hands "on the side just waving back and forth" while Tomada was "swinging downward on him." Bilbrey was still holding the shiny object and Tomada was trying to hold the hand that held the object. The struggle on the ground continued for about 10 seconds by the time Black ran over. As he ran across the street, he noticed Buchanan and McDaniel, whom he had not seen before because they were already on First Street while he was still inside the alley. Black saw a pool of blood and he stepped on Bilbrey's arm and pulled a knife from his hand, throwing it into the street. He helped Tomada up and started to walk him over to a taxi. Neither he, McDaniel, or Buchanan punched Bilbrey or Becchio.

### 6. *Andrew Buchanan's Account*

Buchanan testified that he went through the alley back to First Street with McDaniel and that Black joined them later. Bilbrey was on First Street, across the street from the alley and Becchio was standing back 10 to 15 feet from Bilbrey. Tomada and Bilbrey were already fighting when he saw them. Bilbrey had a knife and it appeared to Buchanan that Tomada was trying to fight Bilbrey off. He saw Bilbrey stab Tomada

6

approximately three times and Tomada was trying to hit Bilbrey. Tomada landed two or three punches and wrestled Bilbrey to the ground. Bilbrey continued trying to stab Tomada and they struggled on the ground for 60 to 90 seconds. He and McDaniel crossed the street and Black picked Tomada off of Bilbrey, covered in a large amount of blood, after taking the knife from Bilbrey's hand and throwing it aside. They tried to move Tomada toward a cab. Neither he, Black, or McDaniel punched Bilbrey or Becchio.

**7.** *Following the Fight*

Simonson had just returned to the police station after calling a cab for Bilbrey and Becchio when he received a dispatch for a knife brandishing on First Street. He arrived on the scene to find Tomada leaning over the back trunk of a cab, bleeding badly. Becchio was sitting nearby on the curb and Bilbrey was lying motionless on the sidewalk with a number of facial injuries.

Tomada and Bilbrey were transported to a hospital. Tomada had a six-centimeter laceration on his cheek, about one to one and one-half centimeters deep, two to three inches from the carotid artery; a through-and-through laceration of the tongue; and a penetrating wound to the floor of his mouth, two to three inches from the jugular vein. Tomada's right eye was split open from front to back. Tomada now has no vision in that eye, which will not recover. Tomada also suffered nerve injury to his left eye and does not have full sight in that eye. According to Tomada, his left eye has 20/80 vision, making him legally blind. He testified that a third of his tongue is hard scar tissue and he can taste nothing but saltiness in that portion of the tongue. He lost halves of two teeth and he has a scar where he was cut on the face.

Bilbrey was diagnosed with a traumatic brain injury and disconjugate gaze, meaning that his eyes were not working in synch.

Officer Kenneth Hart spoke with Bilbrey at the hospital. Bilbrey stated that he had been drinking in the Past Time bar with Becchio and that there had been a non-physical argument with some young men, who had called him a punk. He and Becchio then walked down the street and asked an officer to call them a cab. The officer

requested that a cab be sent and left the scene. Bilbrey then said that he and Becchio got into an argument with a man who was walking with a woman. During the argument, the man punched Bilbrey, knocking him down. Bilbrey walked across the street, but when he turned, he saw Becchio fighting the man. Bilbrey returned and was punched and knocked down again. Bilbrey told Hart that this was all he remembered and that he did not remember who had started the fight.

Bilbrey told Hart that he didn't remember if he had a knife and denied brandishing a knife in front of the bar. Bilbrey then admitted that he might have cut Tomada and said, "I think I cut him when I went down the second time." Bilbrey then told Hart that he was swarmed by a group of people who began punching and kicking him. While he was down, he was able to pull the knife out of his pocket, open it, and cut Tomada. Bilbrey never mentioned being threatened by a group of people in front of the bar and never mentioned fearing for his life.

## B. *The Defense Case*

Bilbrey testified that he carried a knife for protection because he had been beaten and robbed in the past. On the night of his fight with Tomada, Bilbrey had the knife clipped onto the top of his pants.

Bilbrey said that he and Becchio went to the Past Time bar around 1:00 a.m. While in the bar, he did not mention Richmond and did not threaten or intimidate anyone. At last call, Bilbrey made a comment to a woman that apparently offended her. When he left the bar a few minutes later, Apple confronted him about the comment, asking, "Why did you disrespect my friend?" McDaniel, standing next to Apple, said: "What the fuck is your problem? Do you want to get fucked up?" Bilbrey said he was sorry if he offended anyone and didn't want any problems. He went back into the bar to get Becchio and when they exited, Apple and McDaniel again confronted and harassed them. They began to walk away and Becchio yelled, "Fuck you, punks." The group in front of the bar then began threatening them and someone yelled, "You better fuckin' keep walking or you are going to get shot." Bilbrey turned and said: "Fuck you, punks. Don't threaten

me. I already said I was sorry, and I told you we were leaving." Bilbrey also said that he was from Richmond and was not scared of them.

The men started walking toward Bilbrey and he became scared. He took the knife off of his pants, opened it and held it up in the air, saying, "Don't do it. Back off." Bilbrey put the knife back on his pants and he and Becchio turned and started walking up First Street. They sat down on a bench about two blocks up First Street and Bilbrey saw Tomada and Rachelle across the street, arguing and yelling at each other. A police officer pulled up and broke up the argument. Becchio flagged down the officer and asked if he could call a cab for them. The officer told them they would have to get their own cab. Bilbrey told the officer that he was scared because of an argument in front of the bar in which he had been threatened, but the officer told them to keep walking and drove away.

Just before the officer left, Bilbrey and Becchio flagged down a cab. The cab driver said he had a fare in front of them and couldn't give them a ride. Tomada and Rachelle then crossed the street to the cab, stepped onto the sidewalk near Becchio, and started yelling at them about taking their cab. Bilbrey yelled back that they weren't taking the cab and Tomada punched him on the side of the head. Bilbrey fell to the ground and saw Tomada coming at him as he got up. Bilbrey started across the street to get away, but when he turned around, he saw Becchio and Tomada in a wrestling hold. He then heard yelling and screaming from the west side of the street and saw McDaniel, with what looked like a two-foot-long pipe or stick in his hand, accompanied by someone else. McDaniel yelled, "What is up now? You are dead, motherfucker." Bilbrey yelled at them that cops were on the way in order to get them to back off.

Tomada then came in Bilbrey's direction, so Bilbrey put his knife out in front of him and yelled at Tomada to back off. Tomada swung at Bilbrey and Bilbrey struck back with the knife. It felt to Bilbrey that he had made contact with Tomada, but he did not see where he hit him. Tomada's punch connected and Bilbrey was knocked to the ground. Bilbrey was not able to get back up and had not intentionally stabbed Tomada in the eye, mouth or face. When on the ground, multiple people started punching and

9

kicking him at the same time and he was swinging his hands, still holding the knife.  He was knocked unconscious and woke up at the hospital.  He could not see straight for about a week.

The defense also presented evidence concerning prior incidents of violence by Tomada.  In rebuttal to that evidence, the prosecution introduced evidence of an incident in El Cerrito, four days before the fight between Tomada and Bilbrey.  Reid Ainsworth testified that Bilbrey had brandished his knife and threatened to cut him.

## DISCUSSION

### I.  *Sufficiency of the Evidence*

Bilbrey attacks his convictions for attempted murder and aggravated mayhem, contending that there was insufficient evidence of specific intent to kill or to maim.

### A.  *Standard of Review*

" 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]  [¶]  Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206, quoting *People v. Jones* (1990) 51 Cal.3d 294, 314.)

### B.  *Aggravated Mayhem*

Bilbrey was charged with a violation of Penal Code section 205, which provides: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of

10

another human being or deprives a human being of a limb, organ, or member of his or her body.  For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole.”

“Aggravated mayhem is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury, i.e., the permanent disability or disfigurement.  [Citation.]  ‘[S]pecific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors.’  [Citation.]  Thus evidence of a ‘controlled and directed’ attack or an attack of ‘focused or limited scope’ may provide substantial evidence of such specific intent. [Citation.]  However, where the evidence shows no more than an ‘indiscriminate’ or ‘random’ attack, or an ‘explosion of violence’ upon the victim, it is insufficient to prove a specific intent to maim.  [Citation.]”  (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162.)

Bilbrey contends that there was not substantial evidence of a “controlled and directed” attack or an attack of “focused or limited scope.”  He characterizes his fight with Tomada as a “wild melee” in which the “indiscriminate nature of the attack is shown by the multiple blows to markedly differing areas of Tomada’s body—shoulder, knee and face.”  He claims that “[t]here was no evidence to suggest [Bilbrey] specifically aimed at Tomada’s face or that he made a focused jab or stab with the knife at Tomada’s mouth.”  Bilbrey requests that we reduce the charge to simple mayhem (Pen. Code, § 1260).

Tomada testified that before exchanging blows with Becchio, Bilbrey was standing to the side with a knife.  As he finished landing his second blow on Becchio, Bilbrey hit him in his face.  Tomada saw a white flash, and everything went black. Tomada backed up, trying to rub his eye, and felt something go into his mouth, cutting his tongue and breaking his teeth.

As Tomada and Becchio fought, Bilbrey was uninvolved and a jury could reasonably conclude that Bilbrey had an opportunity to decide if, how, and where he would strike Tomada.  For the first blow, Tomada was engaged with Becchio and

11

Bilbrey, who could have stabbed Tomada anywhere in the body, stabbed him in the face. Blinded by this stab wound, Tomada backed up and was again stabbed, this time through his open mouth. The jury could reasonably conclude that Bilbrey's actions were controlled and directed, rather than the result of an indiscriminate attack. Following the two initial wounds, Tomada and Bilbrey struggled on the ground, and the subsequent stab wounds may well have been the result of indiscriminate action, but that fact does not change the character of Bilbrey's earlier blows. We conclude that substantial evidence supported the jury's determination that Bilbrey was guilty of aggravated mayhem and we affirm that finding.

## C. *Attempted Murder*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.] To be guilty of attempted murder . . . , defendant had to harbor express malice toward that victim. [Citation.] Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' " (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

Bilbrey argues that there was insufficient evidence that he had the specific intent to kill Tomada. He also argues, in the alternative, that "even if there was adequate evidence of specific intent to kill, the circumstances negated the element of malice because the fight occurred in the heat of passion and/or [Bilbrey] acted in imperfect self-defense or defense of others."

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank, range "in a manner that could have

12

inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citation.]' " (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)

In *People v. Avila* (2009) 46 Cal.4th 680, 701-702, the court found that defendant's repeated attempts, some successful, to stab the victim, who was unarmed and trapped, was alone substantial evidence of the defendant's intent to kill. In another case, the court found that "appellant's intent [to kill] was established by the evidence of his unprovoked attack that rendered the unarmed victim prone and defenseless as appellant repeatedly stabbed him with a shank he had hidden in his boxers." (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1552.)

Here, the same circumstances and inferences that support a guilty verdict for aggravated mayhem also provide substantial evidence supporting a guilty verdict for attempted murder. Bilbrey initially stabbed Tomada while Tomada was occupied defending himself against Becchio's attack. Bilbrey did not try to disable Tomada's ability to fight by stabbing him in an arm or leg, but instead chose to stab him in the face. Bilbrey argues that if he had intended to kill Tomada, he would have attempted to stab him in the chest or stomach area, but the head is also a vital area and wounds to the head can easily be fatal. Indeed, a physician testified that one of Tomada's wounds came within two or three inches of his carotid artery and another within two or three inches of his jugular vein. After stabbing Tomada in the eye, Bilbrey did not try to gather up Becchio and seek safety while Tomada was disoriented by the blinding blow, but continued his attack on Tomada, again aiming for Tomada's head and stabbing into Tomada's open mouth. From these circumstances, a jury could reasonably infer the requisite intent to kill, and we conclude that substantial evidence supported the jury's determination that Bilbrey intended to kill Tomada.

Bilbrey contends that even if substantial evidence demonstrated an attempt to kill, the evidence also established that he was acting in unreasonable self-defense, defense of another, or was reasonably provoked and acting in the heat of passion, and that this court should reduce the conviction for attempted murder to attempted voluntary manslaughter. On the evidence presented, a reasonable jury could reject all the theories of mitigation

13

that Bilbrey presents. Based on Tomada's testimony, the jury could reasonably view Becchio and Bilbrey as joint initial aggressors for whom no right of self-defense or defense of another arose. Similarly, one who instigates an altercation cannot claim to be justifiably provoked when the victim defends himself. (See *People v Johnston* (2003) 113 Cal.App.4th 1299, 1312-1313.)

We affirm the jury's finding of guilt on the charge of attempted murder.

## II. *Instructions to the Jury*

### A. *Failure to Instruct Jury on "Heat of Passion"*

The trial court did not instruct the jury that the charge of attempted murder could be reduced to attempted voluntary manslaughter if the jury determined that Bilbrey acted because of a sudden quarrel or in the heat of passion. Bilbrey contends that the court erred in failing to include such an instruction and that this error was prejudicial.

A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. St. Martin* (1970) 1 Cal.3d 524, 531; *People v. Aranda* (2012) 55 Cal.4th 342, 354.) "[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) " 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*)

CALCRIM No. 570 provides, in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Bilbrey argues that both the defense and prosecution cases provided substantial evidence which would require the court to instruct the jury on the partial defense of acting in the heat of passion.

For the defense case, Bilbrey argues: "According to [Bilbrey], after taunting him and calling him a 'faggot,' Tomada came up to him, accused him of taking Tomada's cab, and punched him in the face, causing [Bilbrey to fall] to the ground and feel dizzy. [Citation.] He turned around to check on Becchio and saw Tomada and Becchio locked in a struggle. [Citation.] [Bilbrey] heard yelling from the west side of the street and turned back around to see McDaniel and another man running towards him; McDaniel was holding a pipe or a stick and shouting 'What is up now motherfucker? You are dead.' [Citation.] This is more than adequate provocation for [Bilbrey] to panic and attack [Tomado]."

Here, tellingly, Bilbrey argues only that there was adequate evidence of provocation, but completely ignores the other two elements: evidence that he was actually provoked (i.e., acted rashly under the influence of intense emotion) and that the provocation would have caused the average person to act from passion rather than from judgment. Bilbrey's testimony providing his version of the events is devoid of evidence that he acted under the stress of emotion caused by the provocation he describes. Instead, Bilbrey's testimony was that, terrified for his life, he pulled his knife from his pants, but also backed up, with the intent to get away. When, according to Bilbrey, Tomada came at him, he held the knife in front of him and yelled "Back off" a number of times. In his account, he fought with Tomada only after Tomada started to swing at him. Bilbrey painted a picture in which he was forced, against his will, into a fight in order to protect his life, not a picture in which he took actions that, though unjustified, were caused by intense emotion and not rational judgment. Thus, if we consider the defense case, there is no evidence that Bilbrey was actually provoked, and no basis for an instruction on heat of passion.

For the prosecution case, Bilbrey states: "Tomada's version also provides adequate evidence of provocation. According to Tomada, [Bilbrey] did not strike him

15

until after he had knocked Becchio down. [Citation] Tomada testified that appellant struck him twice before he was able to strike back. This suggests that [Bilbrey] had been whipped up into a '[v]iolent, intense, high-wrought or enthusiastic emotion' brought on by the initial confrontation." Here, Bilbrey suggests that he was provoked because Tomada knocked Becchio down. But if we accept Tomada's account, as Bilbrey does here for the sake of argument, then Tomada knocked Becchio down because Becchio attacked him. No reasonable jury could find that an average person would be so provoked by such an act of self-defense as to act from emotion rather than reason. In Tomada's account, Bilbrey and Becchio jointly instigated the altercation and one who instigates an altercation cannot claim to be justifiably provoked when the victim defends himself. (See *People v Johnston*, *supra*, 113 Cal.App.4th at pp. 1312-1313.)

Neither the defense nor the prosecution case presented substantial evidence that all the elements of an instruction on heat of passion would be met. There was no error in the trial court's failure to so instruct the jury.

**B.** *Instruction on Forfeiture of the Right to Self-Defense*

The trial court instructed the jury with CALCRIM Nos. 3471 and 3472. As recited to the jury, CALCRIM No. 3471 provides: "A person who engages in mutual combat . . . [¶] . . . [¶] or who is the initial aggressor has a right to self-defense only if: One, he actually and in good faith tries to stop fighting; two, he indicated by word or by conduct to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he has stopped fighting; and three, he gives his opponent a chance to stop fighting. If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." CALCRIM No. 3472, as read to the jury, provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Bilbrey contends that it was error for the court to give these instructions because there was no substantial evidence supporting a conclusion by the jury that Bilbrey and

16

Tomada engaged in mutual combat or that Bilbrey had provoked the fight with Tomada to create an excuse to use force. He further contends that he was prejudiced by these alleged errors because they confused "the jury on how to apply the law of self-defense to the rather contradictory evidence of the fight and thus undermined [Bilbrey's] self-defense claim."

McDaniel testified that he saw Tomada and Bilbrey "squared up" and "confrontational" from across the street and that they swung at each other at the same time. From this testimony the jury could reasonably conclude that an implied agreement to engage in mutual combat existed between Becchio and Tomada.

Black testified that Tomada and Bilbrey faced each other, arguing, and that Rachelle was trying to pull Tomada away. Then Tomada and Becchio squared off and swung at each other. Because Tomada stayed facing Bilbrey and Becchio, apparently resisting Rachelle's efforts to pull him away, the jury could again reasonably conclude that there was an implied agreement to engage in mutual combat.

Rachelle testified that Bilbrey, with a knife in his hand, and Becchio came up to Rachelle and Tomada from behind. Tomada testified that Bilbrey stood to the side, with the knife in his hands, while Becchio and Tomada engaged. Only after Becchio and Tomada begin a physical confrontation did Bilbrey use his knife against Tomada. The jury could reasonably conclude from this account that Bilbrey provoked the fight as an excuse to use his knife. Such a conclusion would have been reinforced by accounts of the earlier altercation between Apple and Bilbrey in front of the Past Time bar, because the jury could reasonably have believed that Bilbrey, again with a drawn knife, was attempting to provoke a fight, and was prevented from doing so only by Officer Simonson's arrival.

We reject Bilbrey's assertion of error because the jury could have reasonably reached the conclusion that Bilbrey and Tomada engaged in mutual combat or that Bilbrey provoked the altercation as an excuse to use force.

17

**III.** *Denial of Motion for a New Trial*

After the jury returned its verdict, Bilbrey moved for a new trial. Among the errors asserted in that motion, Bilbrey argued, as he does here, that there was insufficient evidence of intent to kill, or that the charge of attempted murder should be reduced to attempted voluntary manslaughter based on either imperfect self-defense, imperfect defense of another, or acting in the heat of passion.

The trial court denied Bilbrey's motion for a new trial after a hearing at which the court observed: "[Bilbrey's] conduct for the entire evening was such that it gave the impression that he was looking for trouble, and there was considerable testimony to that effect. The nature of the wounds is a factor and an important factor. These are not defensive wounds. This is going at a person's face, cheek, and eye. It ties in also to the self-defense. [Bilbrey], in his post-incident statements, didn't talk anything about self-defense or being in danger in any way. He is talking about this is just a standard BS street fight. The victim said he was stabbed before he punched anyone. There was evidence that [Bilbrey] was protecting a friend rather than defending himself, but it certainly doesn't—the evidence doesn't rise to a defense of other given the overall facts."

The statement that "[t]he victim said he was stabbed before he punched anyone" did not accurately reflect Tomada's testimony, which was that Bilbrey did not strike him until after Tomada and Becchio were fighting. Bilbrey argues that because the court's order denying the motion for a new trial was based on an erroneous understanding of the evidence, the court abused its discretion and that we should remand for a new hearing on the motion for a new trial.

The trial court's function, when ruling on a motion for a new trial, "is to 'see that the jury intelligently and justly perform[ed] its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.' " (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.) "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1260-1261.)

18

When the court cited Tomada's testimony, it was considering whether self-defense might apply. The issue was whether there was evidence that Bilbrey had been afraid and was defending himself. The relevant fact from Tomada's testimony was that Bilbrey stabbed him before Tomada had punched Bilbrey. That the court said "anyone" rather than "Bilbrey" does not change the relevant consideration—that in Tomada's testimony, Tomada had not placed Bilbrey in a situation justifying self-defense simply by defending himself against Becchio's attack.

The court then went on to consider defense of another and properly acknowledged that there was some evidence supporting that defense—an acknowledgment that there was evidence that Tomada hit Becchio before Bilbrey stabbed Tomada. However, the court weighed the evidence as a whole and found that "it [did] not rise to a defense of other."

Despite the court's minor inaccuracy, we find no indication that the court did not properly weigh the evidence as a whole. We discern no abuse of discretion in the court's determination that there was sufficient credible evidence to sustain the jury's verdict.

## IV. *The Late Disclosure of the El Cerrito Incident*

### A. *Background*

The prosecution submitted an in limine motion seeking to exclude evidence of past incidents of violence by Tomada. On December 1, 2009, the trial court denied the motion, allowing the defense to present testimony about these incidents, pursuant to Evidence Code section 1103.[5] The trial commenced that day with opening arguments and the start of the prosecution's case.

Denial of the prosecution's motion meant that that the prosecution would be able to present testimony concerning past acts of violence by Bilbrey in rebuttal to the defense

---

[5] Evidence Code section 1103, subdivision (a), allows a defendant to introduce evidence of the victim's character or trait of character to prove conduct of the victim in conformity with the character or trait of character. When a defendant takes advantage of that provision, and the character trait in question concerns propensity for violence, Evidence Code section 1103, subdivision (b), allows the prosecution to present character evidence concerning the defendant's propensity for violence.

19

evidence concerning Tomada. Accordingly, the prosecution requested that the investigating officer re-run Bilbrey's rap sheet. The first time the officer ran the rap sheet on December 2, 2009, it appeared the same as the rap sheet that had originally come to the prosecutor from the police department and was subsequently provided to the defense. Changing the input data in some fashion,[6] the officer ran the rap sheet a second time and this turned up an allegation that Bilbrey had brandished a knife (a violation of section 417) at a bar in El Cerrito three nights before his fight with Tomada. Bilbrey was not arrested or charged in that incident.

On December 3, 2009, the prosecution informed the defense about the incident and that it would likely offer evidence concerning it. At the end of the day, the trial court was informed and defense counsel requested a hearing to determine if such evidence should be admitted, "given the very, very late date that it's been disclosed."

A hearing was held on December 8, 2009, the next day the case was on calendar. The prosecutor explained to the court why the El Cerrito incident had not been previously discovered. The defense asserted that the prosecution was long aware of defense intentions to present evidence concerning Tomada's previous acts of violence and had the opportunity to rerun Bilbrey's rap sheet well before December 2. Defense counsel characterized the late disclosure as "trial by ambush," and suggested that, had she been aware of the El Cerrito incident, she might have decided not to present evidence of Tomada's prior acts of violence  This was not an option available to her now, because she had told the jury in her opening statement that such evidence would be presented. Defense counsel told the court that if it allowed the prosecution's evidence, she would consider the prejudice sufficiently severe to request a mistrial.

After considering the arguments of both sides, the court observed: "Now, I don't think—frankly, I don't think it's fair to the People to prevent the introduction of the evidence that you talk about in this matter. On the other hand, it is not fair—it was not

_____

[6] The prosecutor informed the court that the investigating officer "changed the date of birth or something was changed that might assist, I guess, with the pulling of the rap."

fair at the beginning of these proceedings to permit [defense counsel] to go ahead and say 'We're going this way,' when maybe she shouldn't have gone that way or should have made a decision to go the other way. I think it's a very serious dilemma, and I think that it's necessary that the court try to be fair to both sides in this matter." The court continued: "But the way I'm leaning, frankly, is to grant a mistrial because, one, I think that your evidence is relevant; two, I think that [Bilbrey] has been put to a serious disadvantage because of the way this came forward. And I'm not trying to blame anybody. I can sort of understand as I listen to both of you, but the fact of the matter is that [Bilbrey] has been prejudiced; the fact of the matter is, you have evidence that is relevant to these entire proceedings in the way it has been going." The court concluded: "I think in fairness to the People and [Bilbrey], my only recourse is to grant a mistrial, and I intend to do so. I do at this point."

Defense counsel then asked for a recess, before the court made its ruling final, to discuss its legal significance with Bilbrey. Before recessing, defense counsel requested a clarification as to what evidence would come in if Bilbrey were to withdraw his request for a mistrial. After a clarification that the rebuttal evidence as to Bilbrey's propensity for violence would be limited to the El Cerrito incident, and would not include evidence of other incidents that had been disclosed, defense counsel withdrew the request for a mistrial, without recessing for discussion with Bilbrey.

The following day, defense counsel informed the court that the complaining witness in the El Cerrito incident, Reed Ainsworth, "has multiple felony convictions and other arrests which appear to be for items involving moral turpitude." Because she did not have the ability or time to investigate so that she could properly cross-examine Ainsworth, defense counsel requested that the court disallow the witness. During discussion, defense counsel also suggested that a continuance of a week or two would allow her to fully prepare to cross-examine the witness.

The court stated: "In trying to balance the equities between the two sides here, and taking into consideration the jury, as well, I am going to permit Ainsworth to testify . . . ." The court also stated that defense counsel would be allowed to impeach Ainsworth with

the felony convictions that appeared on his rap sheet. Defense counsel again requested a continuance and the court denied the request.

## B  *Bilbrey's Attribution of Error*

Bilbrey argues that the prosecution "violated its discovery obligations by failing to timely disclose impeachment witnesses and springing them on the defense in the middle of trial. The trial court then compounded the harm by denying the defense adequate time to investigate the new witnesses and to prepare effective cross-examination. This sandbagging completely undermined the defense approach and in particular, the statements trial counsel made to the jury in opening arguments about Tomada's violence, and [Bilbrey's] lack of violent history." Bilbrey contends that under the circumstances of this case, he was denied his rights to due process and effective assistance of counsel under the United States Constitution.

We disagree with Bilbrey that the prosecution was guilty of a discovery violation. Section 1054.1 requires a prosecuting attorney to disclose the names and addresses of all persons he or she intends to call as witnesses at trial. This duty includes the disclosure of rebuttal witnesses that the prosecutor reasonably anticipates calling at trial. (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375, called into doubt on other grounds in *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1133, fn. 13.) Section 1054.7 provides: "The disclosures required under this chapter shall be made at least 30 days prior to the trial . . . . If the material or information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ."

It is true that information about the El Cerrito incident and Ainsworth was not provided to Bilbrey 30 days prior to trial, but this does not constitute a violation of the discovery provisions unless the prosecution knew of the incident 30 days before trial, or did not otherwise immediately disclose it. The record before us contains only the prosecuting attorney's explanation, indicating that the El Cerrito incident was uncovered on December 2 and disclosed on December 3. Nothing in the explanation provided to the court indicates a willful withholding of information, or even negligence in performing a prosecutorial duty that led to the late uncovering of the incident. The record provides no

22

reason why we should not accept the prosecuting attorney's explanation, which would place any "blame" here on the state of the database from which rap sheets are queried, resulting in different reports on the same individual based on differences in the query parameters supplied as input. We have no reason to conclude that a discovery violation occurred.

Whether or not the prosecution committed a discovery violation, the defense may have been prejudiced by the late disclosure of the El Cerrito incident. Defense counsel had already committed herself, in her opening statement, to a defense that would attack Tomada's character with testimony concerning his previous violent acts. Additionally, defense counsel had assured the jury that Bilbrey had no violence in his past. Defense counsel made a strategic choice in how she would conduct Bilbrey's defense without knowledge that it would open the door for the prosecution to introduce evidence concerning the El Cerrito incident. The trial judge fully appreciated the potential prejudice to Bilbrey's defense occasioned by this late disclosure.

In *Gimbel v. Laramie* (1960) 181 Cal.App.2d 77, the court improperly received evidence out of court by seeking the comment of a friend, who was an amateur photographer, about a photograph that had been introduced into evidence. (*Id.* at p. 85.) Because of this, the plaintiff's attorney could have successfully demanded a mistrial. (*Ibid.*) Instead, the plaintiff's attorney requested permission to reopen his case and offer contradictory evidence. (*Ibid.*) The appellate court held: "By electing to reopen his case, rather than move for a mistrial, appellant waived his right to a new trial or to a reversal of the judgment on that ground. Counsel may not elect to introduce additional evidence to counteract evidence wrongly received by the court, speculating upon a favorable judgment, and at the same time reserve his objection in the event the judgment should be adverse to him." (*Id.* at pp. 85-86.)

We conclude that, similarly to *Gimbel*, Bilbrey has waived his right to object to any prejudice occasioned by the late disclosure of the El Cerrito incident. The trial court offered defense counsel a remedy—declaring a mistrial. Defense counsel, however, after assurances about the scope of evidence concerning Bilbrey's prior acts that would be

23

offered by the prosecution, elected to proceed with the trial.  When faced with further consequences of that decision—lack of time to prepare for the cross-examination of Ainsworth—defense counsel did not renew the request for a mistrial, as she might have done, after her request for a continuance was denied, but again elected to proceed.  Because defense counsel was aware, at all points, of the potential prejudice and could have remedied that prejudice by accepting a mistrial, Bilbrey cannot, on appeal, seek reversal when these strategic decisions did not result in the outcome he desired.

## C.  *Inadequate Assistance of Counsel*

Bilbrey argues that he was denied his right to adequate assistance of counsel because defense counsel withdrew her request for a mistrial on December 8, 2009, and because, the next day, she failed to renew her request for a mistrial after her request for a continuance was denied.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation.  [Citation.]  Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)  "If 'counsel's omissions resulted from an

informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' " (*People v. Diaz* (1992) 3 Cal.4th 495, 557.)

Because the record does not reveal defense counsel's reasons for withdrawing the request for a mistrial and not renewing the request the next day, we must affirm Bilbrey's conviction unless there could be no satisfactory explanation. We conclude that there could be a satisfactory explanation.

On the morning of December 8, when the issue of a mistrial arose, all of the prosecution's percipient witnesses had already testified to their versions of the events. Tomada was still on the stand, but his direct examination had concluded. Defense counsel was fully aware at this point of the prosecution's case and would have realized that Bilbrey's testimony would be contrary to at least parts of the testimony of all these percipient witnesses, including witnesses such as cab driver Alameda and Officer Simonson who would have no reason to prevaricate if Bilbrey's account were true. Defense counsel may well have calculated that if a mistrial were granted and the trial began anew, she would still need to establish Tomada's propensity for violent acts in order to mount a defense that had any hope of success. In that case, evidence of the El Cerrito incident would still come in and the defense would be in the same position. We are unable to conclude that no satisfactory explanation could account for defense counsel's withdrawal of the request for a mistrial.

The next day, defense counsel did not renew her request for a mistrial when the judge denied her request for a continuance to investigate and prepare for the cross-examination of Ainsworth. However, the request for the mistrial was based on the prejudice to the defense of having decided on a defense strategy—showing Tomada's propensity for violence—without having full information about incidents the prosecution might use in rebuttal. If defense counsel had determined that she would, even after a mistrial were declared, mount the same defense, then there was no actual prejudice and no valid ground for requesting a mistrial at that point. We are unable to conclude that no satisfactory explanation could account for defense counsel's failure to renew the request for a mistrial.

## V. *Cumulative Error*

Bilbrey alleges two additional errors, the individual effects of which would not require reversal, but which in combination create reversible error. We conclude that Bilbrey fails to show that the first alleged error was actual error and that he has waived the second alleged error on appeal.

## A. *Evidence Regarding Tomada's Ability to Care for His Son*

While questioning Tomada, the prosecutor followed a line of questioning that elicited the information that the damage to Tomada's eyes was such as to limit his ability to care for his diabetic son, who also had an allergy to wheat gluten, because he did not see well enough to read the glucose monitor or read the ingredient labels on food. Twice during the line of questioning, the court overruled defense counsel's objection that the testimony was not relevant. Bilbrey contends that "this dramatic and compelling" testimony was "highly irrelevant and prejudicial" and that it was error for the court to admit it.

In order to prove its case for aggravated mayhem, the prosecution had to show that Tomada suffered a permanent disability or disfigurement. (§ 205.) Demonstrating how injury to Tomada's eyes had affected his life was relevant because it showed how Tomada was disabled by his injuries. Thus, the court was justified in overruling objections that the testimony was not relevant and there was no error.

## B. *Prosecutorial Misconduct*

During closing argument, the prosecutor said: "why isn't [Becchio] here to tell his side of the story? Maybe he doesn't want to commit perjury." Defense counsel objected that this constituted improper argument. The court sustained the objection, but defense counsel did not request, nor did the court provide, an admonition to the jury. Bilbrey asserts that the prosecutor's suggestion that Becchio didn't want to commit perjury was "prosecutorial misconduct that further injected unfairness into [his] trial."

"To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury. [Citation.] . . . [Citation.] Failure to make a specific and

timely objection and request that the jury be admonished forfeits the issue for appeal unless such an objection would have been futile." (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Here, defense counsel made an objection but failed to request that the court admonish the jury. Such a failure might be overlooked on appeal if a request for admonishment would have been futile, but Bilbrey does not make this argument—nor does the record support such an argument.

In any case, Bilbrey acknowledges that even if we agreed that prosecutorial misconduct occurred, the prejudice was not so great, in itself, as to require reversal. He raises the issue of prosecutorial misconduct for us to consider along with other alleged errors, arguing that their cumulative effect rendered his trial so unfair as to require reversal. Having found no other errors, we would be unable to reverse the result based on this issue alone.

## VI. *Cruel and Unusual Punishment*

Bilbrey challenges the sentence of life in prison, with the possibility of parole, for his conviction of committing aggravated mayhem. He contends that this sentence constitutes cruel and unusual punishment under both the state and federal Constitutions. Because Bilbrey did not raise this issue below, it is waived on appeal. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; *People v. Kelley* (1997) 52 Cal.App.4th 568, 583.)

## DISPOSITION

We affirm the judgment of the trial court.


Lambden, J.


We concur:

Haerle, Acting P.J.

Richman, J.


27